NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE DEPENDENCY AS TO Z.W.

No. 1 CA-JV 22-0251
FILED 6-6-2023

Appeal from the Superior Court in Yuma County
No. S1400JD20210147
The Honorable Stephen J. Rouff, Judge (Retired)

**AFFIRMED**

COUNSEL

Meerchaum & Orduno PLLC, Yuma
By Candice Orduno-Crouse
*Counsel for Appellant Gary W.*

Law Office of Elizabeth M. Hale, Lakeside
By Elizabeth M. Hale
*Counsel for Appellant Amber H.*

Arizona Attorney General's Office, Tucson
By Dawn Rachelle Williams
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the court, in which Presiding Judge Samuel A. Thumma and Judge Anni Hill Foster joined.

---

**H O W E**, Judge:

¶1 Amber H. ("Mother") and Gary W. ("Father") appeal the juvenile court's order adjudicating their daughter Z.W. dependent. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2 "[W]e view the evidence in the light most favorable to sustaining the juvenile court's findings." *Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 235 ¶ 21 (App. 2005). In December 2020, Mother gave birth to Z.W. at 30 weeks' gestation in Yuma, Arizona. After her birth, Z.W. had medical needs, including feeding difficulties requiring a feeding tube and special formula. She remained in the neonatal intensive care unit for about a month. Hospital notes indicated that Mother and Father missed visits with Z.W. or stayed for just a few minutes at a time, and they therefore missed opportunities to hold her or participate in her care.

¶3 When Z.W. was ready to be discharged, she no longer required a feeding tube and was feeding well on specialized formula. Z.W.'s doctor was concerned about Mother properly feeding Z.W. and asked her to stay overnight to demonstrate her ability, but Mother declined because she was "in the middle of moving" and "didn't have the time to do that." Hospital staff instructed Mother to feed Z.W. every three hours and to schedule a follow-up appointment with an ophthalmologist because premature babies are at higher risk for developmental delays to their optic nerves, which, if untreated, could cause vision problems or blindness.

¶4 At home, Mother, Father, and Z.W.'s paternal uncle took turns caring for her. The parents missed Z.W.'s two-month well check and two ophthalmologist appointments, leading the Department of Child Safety to investigate. The Department found additional missed medical appointments and was concerned with Mother's report that she was having difficulty maintaining employment because of Z.W.'s medical needs. When Mother completed the eye appointment, the Department closed the investigation.

**¶5** Meanwhile, during one of Z.W.'s checkups in February 2021, a doctor noted that she was missing her frenulum (a small fold of skin beneath the tongue) and had some redness where it should have been. Mother denied any trauma had occurred. Mother later contacted Z.W.'s pediatrician and reported that Z.W. was vomiting, having bloody stool, and having skin reactions. The day that the parents switched Z.W.'s formula, Z.W. did not eat all day because Mother was waiting for Father to pick up the formula.

**¶6** Mother made differing statements on how often she would feed Z.W. Despite a pediatric nurse counseling Mother on feeding techniques, Z.W. had lost twelve ounces and appeared emaciated and frail; she was not smiling or cooing. The pediatric nurse instructed Mother to take Z.W. for lab tests as soon as possible. The parents, however, did not take Z.W. to the lab for another week. Lab results showed that Z.W. had hyperthyroidism, a high platelet count (suggesting dehydration), and a low-grade viral infection. The nurse also changed Z.W.'s formula to one with higher calories that infants generally tolerate better. Z.W. regained 12 ounces, and her other symptoms subsided.

**¶7** On April 21, Mother fed Z.W. and put her to bed at 8:00 a.m. Z.W. woke up around 1 p.m., and Mother put her on her belly while she prepared a bottle for her. Father went into the backyard to tend to their dogs. When Mother returned, she found Z.W. limp, pale, unresponsive, and breathing slowly. Father attempted to rub Z.W.'s sternum. Eventually, Z.W. began posturing—flexing her back and extending her arms in a rigid manner. They called 9-1-1.

**¶8** The paramedics arrived around 3:00 p.m. They found Z.W. pale and unresponsive and with several red marks on her face and body. She had not eaten since that morning. The parents denied that Z.W. had experienced any seizures, falls, or injuries. The parents provided no additional explanation, but Mother questioned whether one of the dogs was the cause. They did not mention Z.W.'s posturing or recent fever. In the ambulance, Z.W.'s body stiffened into an abnormal body posture called decerebrate posturing, which occurs regularly with trauma and brain injury but can also result from hypoxia, meningitis, or stroke. After leaving Z.W. at the hospital, the paramedics filed a report with the Department.

**¶9** At the hospital in Yuma, Mother again denied that Z.W. had experienced any accidents, injuries, or illness and did not mention the infant's recent fever. Hospital staff intubated Z.W. to help her breathe, gave her anti-seizure medication, and performed tests on her. Because the

hospital did not have a pediatric intensive care unit, Z.W. was flown to Phoenix Children's Hospital ("PCH"). After Z.W. had an MRI at PCH, the pediatric neuroradiologist diagnosed her with two subdural hematomas—bleeding into her brain—a spinal bleed, a spinal ligament injury, and other possible damage to her brain. The hematomas appeared to have occurred at the same time within the previous 10 days.

¶10       After review, the director of PCH's child protection team ("Director") concluded that Z.W.'s injuries were highly suspicious for abusive head trauma and that no other diagnosis could explain her current and former injuries. The Director noted that Z.W. was malnourished; tests revealed the infant was unable to swallow properly and required a feeding tube. Mother could not explain Z.W.'s injuries.

¶11       The Department further investigated, and law enforcement also investigated. The detective interviewing Mother reported that she showed very little emotion except when talking about the Department or accusing the hospital of causing Z.W.'s injuries. In addition, Mother's and Father's explanations for the injuries changed and evolved. Pursuant to a valid search warrant, police recovered heated text messages on the parents' phones, in which Mother threatened to tell police "the real truth about [Father]" and expressed concern that Z.W.'s paternal grandfather would "open[] his mouth and . . . cause[] an issue" that would result in her losing her parental rights to Z.W. Ultimately, the parents were arrested and indicted on criminal charges.

¶12       The Department petitioned the court to adjudicate Z.W. dependent based on abuse and neglect and placed her with a foster family. The Department offered the parents services, including psychological evaluations, parenting services, clinically supervised visits, supervised visits, and transportation assistance. The parents participated in supervised visits but declined to participate in any other services.

¶13       By trial, Z.W. had gained weight and was feeding by mouth but still required a feeding tube. During trial, Mother testified that she thought the instructed feedings were "too much," so she would feed Z.W. "[i]f she show[ed] cues," including "crying and a sucking motion." She added that "if [Z.W.] didn't want the bottle, we didn't give the bottle to her." The pediatric neuroradiologist opined that Z.W.'s spinal injury suggested that she suffered a direct injury to the spine in addition to her head, which suggested abusive head trauma.

¶14 The Director testified that Z.W. appeared "really malnourished" and that the scratches and excoriations on her head and body were in areas where she could not have inflicted them herself. In reviewing Z.W.'s past records, the Director noted significant concern about her possible torn frenulum, which in nonmobile infants only results from force, such as forced feeding. The parents' neurologist opined that a stroke caused Z.W.'s injuries. But the Director and the Department's pediatric neurologist disagreed with his opinion. The pediatric neurologist further explained that Z.W.'s head and spinal hematomas were in two different spaces relative to the dura, so it was not likely that one could have caused the other.

¶15 After trial, the juvenile court adjudicated Z.W. dependent. It found specifically that "the parents have been consistently defensive and uncooperative with [the Department] and have refused all services except supervised visitation," which "has caused the initial concerns regarding parental competency to remain unchanged." It also found that Z.W. "is still a vulnerable child due to her health and age" and that the parents "are currently not minimally competent parents and are unable to provide [Z.W.] with proper care in a safe environment." The juvenile court rejected the parents' assertion that medical conditions caused Z.W.'s malnourishment. It found that "she was a very vulnerable child who was not receiving minimally adequate parental care" and "[s]he was not thriving and was malnourished and grossly underweight while in her parents' care." It further found that she "was not being timely or properly fed," and that her "medical needs were not being adequately addressed." The parents timely appealed.

## DISCUSSION

¶16 The parents argue that the juvenile court erred in adjudicating Z.W. dependent because insufficient evidence supports the juvenile court's order.[1] We do not disturb a dependency adjudication unless no reasonable evidence supports it. *Willie G.*, 211 Ariz. at 235 ¶ 21. This court "review[s] the [juvenile] court's interpretation and application of the dependency statute de novo." *Carolina H. v. Ariz. Dep't of Econ. Sec.*, 232 Ariz. 569, 571

---

[1] Father also argues that the juvenile court should have dismissed the case because it did not find abuse and the petition did not assert neglect. He has misread the record. The petition expressly alleged neglect and abuse. Although the language in the supportive factual allegations does not expressly track the neglect provision, it is similar enough to put Father on notice that the Department was pursuing neglect.

¶ 5 (App. 2013). A dependency petition must contain "[a] concise statement of the facts to support the conclusion that the child is dependent." A.R.S. § 8–841(C)(3); *see also* A.R.S. § 8–201(27) (defining "petition" as "a written statement of the essential facts that allege . . . dependency").

**¶17** The juvenile court must determine whether a child is dependent by a preponderance of the evidence. A.R.S. § 8–844(C)(1). A "dependent child" is one "whose home is unfit by reason of abuse [or] neglect . . . by a parent, a guardian or any other person having custody or care of the child." A.R.S. § 8–201(15)(a)(iii). "Neglect" is a parent's "inability or unwillingness . . . to provide [a] child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes substantial risk of harm to the child's health or welfare." A.R.S. § 8–201(25)(a).

**¶18** "The juvenile court must consider the circumstances as they exist at the time of the dependency adjudication hearing in determining whether a child is a dependent child." *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 48 ¶ 1 (App. 2016). A child may be dependent when the parent is unwilling or unable to protect the child from abuse or neglect. *See id.* at 50 ¶ 14. But the circumstances that put the child at risk for abuse or neglect "need not be continuous or actively occurring at the time of the adjudication hearing to support a finding of dependency"; rather, "the substantiated and unresolved threat is sufficient." *Id.* at 51 ¶ 16.

**¶19** Sufficient evidence supports the juvenile court's ruling. The parents were Z.W.'s main caregivers, and they oversaw her care the day she required emergency services. They did not provide paramedics and hospital staff reasonable explanation for her injuries. The juvenile court found that Z.W.'s injuries were "caused by some kind of trauma," and although it could not determine whether the trauma was "accidental, intentional, or recklessly caused," it found that the "inescapable reality is that [Z.W.] was a very vulnerable child who was not receiving minimally adequate parental care." Z.W. suffered serious injuries she could not have inflicted herself, requiring her to be airlifted to PCH. Numerous medical professionals assessed Z.W. and determined that no other medical cause explained her injuries, and thus they suspected abusive head trauma.

**¶20** In addition, the evidence shows that Z.W. was malnourished. Z.W. was a premature child who needed extra care. Yet the parents refused to stay overnight so hospital staff could observe and give feedback on how to feed her. Z.W. was feeding well on the formula when doctors discharged her home. But after only two months in the parents' care, Z.W. had lost 12 ounces and was failing to thrive. Although she gained that weight back

when she was fed new formula, just a few days later, PCH doctors determined she was nevertheless "really malnourished." The juvenile court found that Z.W. did not receive "minimally adequate parental care," she "was malnourished and grossly underweight while in her parents' care," she "was not being timely or properly fed," and her "medical needs were not being adequately addressed."

¶21 Furthermore, the parents had missed or delayed several medical appointments. Additionally, Mother's waiting to feed Z.W. until she showed cues like crying, the parents' inconsistent stories about how often they would feed her, and their text messages that Z.W. had not eaten all day support a reasonable inference that they were not feeding Z.W. every three hours as instructed. Indeed, Z.W.'s thyroid issue resolved at PCH, and her endocrinologist ultimately opined that her former abnormal labs were the result of malnutrition, not a disease. These findings support the court's determination that the parents neglected Z.W.

¶22 Reasonable evidence at the time of the dependency adjudication hearing also supports the court's ruling. The court found that the parents "have been consistently defensive and uncooperative with D[epartment]." And by refusing all services except for visitation, the parents missed opportunities to demonstrate their parental competency. Additionally, they participated in only a few extra visits with Z.W., did not attend feeding class, did not ask about or attend most of Z.W.'s medical appointments, and had not yet articulated a plan to keep her safe or meet all of her medical appointments and needs. Their last-minute agreement to participate in clinically supervised parenting time and a general parenting class does not negate the court's finding that they remained unable to provide Z.W. with proper care in a safe environment.

¶23 The parents argue Z.W.'s injuries were the result of a stroke—their main theory at trial. The juvenile court considered this evidence but ultimately found that even if Z.W. suffered a stroke, the trauma or malnourishment that the parents inflicted on her caused the stroke. Regardless, reasonable evidence supports the court's decision to reject the parents' theory. The Director and the pediatric neurologist disagreed with their expert's opinion that a stroke caused Z.W.'s injuries. The Director testified that that theory had been conclusively refuted in medical literature. The neurologist further explained that Z.W.'s head and spinal hematomas were in two different spaces relative to the dura, so one could not have likely caused the other.

¶24        Finally, both parents assert that the juvenile court was required to find they knew or reasonably should have known about the neglect. This requirement is present only in the termination statute, however, not the dependency statute, which requires only that a parent be "unwilling or unable" to provide a child with certain basic needs. *Compare* A.R.S. § 8–201(25)(a) (requiring the court to determine whether the parents were unable or unwilling to provide the child with certain basic needs) *with* A.R.S. § 8–533(B)(2) (to terminate a parent's rights to a child, the court must find "the parent knew or reasonably should have known that a person was abusing or neglecting a child"). Because sufficient evidence in the record supports the juvenile court's ruling, the court did not err.

## CONCLUSION

¶25        For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA

8